IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Christian Alejandro Sánchez Guzmán, | |
| Plaintiff/Petitioner, | |
| v. | Case No. 1:17-cv-7939 |
| Durvin Pamela Mera Cabrera, | Judge: John Z. Lee |
| Defendant/Respondent. | |

**PETITIONER'S TRIAL BRIEF**

This is a proceeding under the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"). It is not a custody proceeding; it is essentially a jurisdictional proceeding to ensure the "prompt return of children who have been wrongfully taken or kept away from their 'habitual residence.'"[1] The questions before the Court are not "what is in the best interests of the children?" or "who is a more suitable parent?" but rather, simply, (1) were the children habitual residents of Spain when they were removed to the United States by their mother, the Respondent, in 2015? (2) was the removal wrongful and against the rights of the children's father, the Petitioner? and (3) does any affirmative defense to the remedy of removal apply?

The Court's resolution of the questions before it does not resolve questions of custody, but rather simply where such questions will be addressed. The Hague Convention and ICARA remove incentives from those like Respondent from kidnapping children as a means of forum

---

[1] Garbolino, J., The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges, Federal Judicial Center International Litigation Guide, 2015, hereinafter "FJC Hague Guide," at ix.

shopping or retrying unsuccessful custody proceedings in their and the Children's home country.[2]

That is what this case is about: It is uncontroverted that Respondent instituted a divorce and custody proceeding in Spain, the home country of herself, the Children, and Petitioner. Answer at ¶21. She lost, and Petitioner has legal custody awarded by the only court ever to have been presented with the underlying custody dispute. *Id.*, Complaint Ex. G. This is very much the exact situation the Hague Convention was designed to discourage and to remedy: Parents may not use international removal of children from the other parent as a self-help remedy when they are unhappy with the lawful results of custody laws or decisions of their home country. Having wrongfully removed the Children and deliberately concealed them from their father, she now seeks to use her success in evading justice to legitimize keeping them in the United States.

### Petitioner's Prima Facie Case of Wrongful Removal

Petitioner has a clear-cut prima-facie case that the Children were habitual residents of Spain at the time of their removal by Respondent, and that such removal was wrongful and against the Petitioner's rights of custody.[3] It is undisputed that Petitioner is the father of both J.S.M. and C.A.S.M, (Answer, ¶8) that J.S.M. was born in Spain in 2005 (Answer, ¶9) and that C.A.S.M. was born in Spain in 2012 (Answer, ¶10). Likewise undisputed is that Respondent removed the children from Spain to the United States on or about October 6, 2015. (Answer, ¶26).

---

[2] 22 U.S.C. §9001; U.S. State Department Text & Legal Analysis, "If the Convention machinery succeeds in rapidly restoring children to their pre-abduction or pre-retention circumstances, it will have the desirable effect of deterring parental kidnapping, as the legal and other incentives for wrongful removal or retention will have been eliminated." Hereinafter "Text & Legal Analysis." N.B.: The Text & Legal Analysis, drafted by the U.S. State Department at the time the Convention was newly adopted, also carries interpretative weight. U.S. State Department Text & Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986). *See* FJC Hague Guide at fn 73.

[3] Spain has been a party to the Hague Convention since 1987. https://www.hcch.net/en/publications-and-studies/en/instruments/conventions/status-table/?cid=24. The U.S. has been a party since 1988. *Id.*

As the undisputed father of both children, Petitioner held custody rights at the time of their removal in October 2015 by operation of Spanish law. Under the Hague Convention, a removal is wrongful if:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, Art. 3. "Rights of Custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention at Art. 5.

Under Spanish Law, Petitioner meets the requirements to establish custody rights and exercise of them at the time of removal. The Spanish Ministry of Justice has issued its opinion under Article 15 of the Hague Convention that in situations such as this one, removal by one married parent, even if living separately, is wrongful. Specifically, the Ministry of Justice interprets Spanish law such that:

> both progenitors, married or not, are the holders of parental authority over their joint minor children. In cases of breakup of partnership or cohabitation, the partners unusually maintain the shared parental responsibility and in the event there is no shared parenting regime established, one of the parents will have the custody and the other will have a visiting system **but they will always exercise jointly their parental authority, except where otherwise determined by the judge.** In any case, in both breakup and not breakup of cohabitation situations, **the decision to fix the place of residence of the minor, to change the minor's domicile, to move the minor to a different place from his habitual residence or move him aboard, always needs the consent of both parents** and, failing this, the judicial authorization. **The cessation of cohabitation among parents does not at all affect the inherent powers of both progenitors to exercise their parental rights which are usually shared in most cases by both parents**. . . . Thus, it is very important to note that, in Spain, when a person only has the right to visit his/her child being also co-holder of parental authority, retains signifiant

- 3 -
44552840;1

>rights and duties concerning the decisions to be taken about the child . . . . Although that person is the non-custodial partner and only has the right of access/contact, it is required the consent of both parents as holders of *patria potestas*[4] or by default, judicial authorization for the minor traveling abroad.

Complaint Ex. I at 2.

There is no dispute that the Petitioner did not authorize the removal of the children to the U.S.[5] and promptly took steps to contact the relevant authorities in Spain. Complaint ¶15, 19. Nor is there any dispute that the Children lived in Spain prior to their wrongful removal, and had never been to the United States before their removal. Answer ¶18. Indeed, the Children's passports reflect that they had left Spain only once when they were removed to the US. Ex. B, J.S.M. and C.A.S.M. passports.

Likewise undisputed is that in the divorce proceeding Respondent initiated in Spain, Petitioner was granted full custody of the children, and that Respondent was found to have shown a "complete lack of cooperation with [Petitioner] in order to ensure maximum stability in the children's life" and had "prevent[ed] the children from having an adequate relationship with their father as they did before the departure." Answer ¶21, Complaint Ex. G.

### Respondent's Defenses are Inapplicable

Respondent has raised three affirmative defenses in this case. She relies on Article 12 of the convention to argue the Children are "settled" in their new environment. Answer Dkt. 34 at 13. She relies on Article 13(b) to argue that the children are at "physical or psychological harm" or placed in an "intolerable situation." Answer Dkt. 34 at 14. And she relies on Article 13 to

---

[4] "*Patria potestas* is a legal concept derived from Roman Law that connotes "all the duties and rights of the parents in relationship to their children who have not reached majority, regarding the care, development and education of their children." FJC Hague Guide at 41.

[5] Several months before Respondent fled with the children, Petitioner authorized issuance of passports to each of them. That does not establish, though, consent to their removal to the U.S. *See Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *11 (S.D. Fla. Oct. 23, 2008) (finding that the "Permission to Travel" signed by the father supported his claim that he did not consent to his daughter's removal to the United States because the document says nothing about the child permanently moving or relocating).

argue that J.S.M. is a "mature" child who objects to return. Answer Dkt. 34 at 14. Each defense in inapplicable.

      A.      The Children are Poorly Settled

For the well-settled defense to apply, "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."[6] There are numerous, fact-intensive factors considered in determining whether a child is well-settled. FJC Hague Guide at 96. None favor Respondent.

Respondent admittedly moved herself and the children to the U.S. to reside with her on-again-off-again boyfriend. Ex. A, Mera Tr. at 53:19-23. Now, she claims that they have become well-settled, justifying their retention here in violation of their father's rights and the basic principles of the Hague Convention. The facts, though, plainly demonstrate that they are anything but "well" settled. The children and their mother live in a 2-bedroom basement apartment. J.S.M., a thirteen year old boy, shares a bedroom with C.A.S.M., his six-year old sister. Mera Tr. at 62. They reside there with Respondent and Respondent's boyfriend, Juan Carlos Escalante.

Respondent's presence and the children's presence in the United States is unlawful, having overstayed their tourist visas. Ex. B, Passports. In fact, Respondent allowed the children's passports to lapse entirely. *Id*. Respondent has no reasonable plan to obtain citizenship for herself or the children. When asked, the only plan offered was to obtain citizenship by marrying her boyfriend, Mr. Escalante. Mera Tr. at 100:2-5.

A significant obstacle exists with respect to that plan: Respondent does not believe her divorce to Petitioner is final, and Mr. Escalante is married to another woman as well. Mera Tr. at

---

[6] Text & Legal Analysis at 10,509.

11:8-21. Mr. Escalante is unaware of the whereabouts of his wife, who like Respondent was an illegal resident of the US when they married. Escalante Tr. at 55. No divorce proceedings are pending. *Id.* There is no alternate plan to marrying Mr. Escalante. Mera Tr. at 12. Mr. Escalante has had many residences—never living in one place more than 4 years. Escalante Tr. at 24. He has at least one wife, and at least one child by a yet another woman by whom he was brought into court to pay child support. Escalante Tr. at 55-56. (See also Ex. D, record of proceedings in Cook County Domestic Relations Court brought by States Attorney Child Support Unit to recover child support).

J.S.M., according to Respondent, does not know that it will be illegal for him to work in the U.S. when he is old enough because, according to Respondent, "if we legalize everything, they would also have documentation." Mera Tr. at 99:18-24. Nevertheless, there is no plan B to marrying her boyfriend. Comparatively, the children's status as citizens of Spain entitles them, as European Union residents to work in Spain or any other EU country when they reach the appropriate age.[7] In short, there is a future for them as EU citizens, but not in the US given the way their mother has selfishly dictated their lives.[8]

J.S.M. is particularly poorly settled. He is failing multiple subjects and standards in school, and his performance is worsening. Ex. E, CAB015 (showing a 2.1 English learner proficiency, out of a scale of 0-6[9]). His grades have been poor and have failed to improve

---

[7] See http://ec.europa.eu/social/main.jsp?catId=25&langId=en

[8] Uncertain immigration status may weigh against a finding of "well-settled" even if there is no immediate threat of deportation. *In re Koc*, 181 F. Supp. 2d 136, 154 (E.D.N.Y. 2001), report and recommendation adopted (Apr. 3, 2001). Some decisions from other circuits apply varying weight to immigration status. *See e.g. Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012). However, it cannot be ignored that such decisions were rendered under a far different reality in terms of immigration enforcement, and that Chicago in particular is in the midst of a targeted uptick in immigration enforcement across the board. *See* "Spike in Chicago immigration arrests, deportations," ABC News, Chicago, *available at* http://abc7chicago.com/spike-in-chicago-immigration-arrests-deportations/2290817/.

[9] The categories are defined as: 1–Entering, 2–Emerging, 3–Developing, 4– Expanding, 5–Bridging, and 6– Reaching, based on specific standards. Children must progress through all six levels to graduate out of the English

substantially. *Id.* at CAB016 (showing significantly declining grades in math, social studies and writing, showing over 17 days absent in 2016/17); *Id.* at CAB018 (requesting conferences on reading, science, and social science); *Id.* at CAB019 (failing grades in reading standards, writing standards, social science standards, and poor grades in mathematics standards and science standards). His school record reflects a staggering number of unexcused absences as well. *Id.* He also, as a 13 year old boy, has to share a bedroom at age of 13 with his 5 year old sister. Mera Tr. at 62.

C.A.S.M. is similarly poorly settled, but as a threshold matter is too young to be considered well-settled, being only in kindergarten. Even so, she, like her brother, has an unenviable situation forced upon her by her mother's decisions. She is awoken at 5:00 am by her mother and picked up by strangers from a day care facility. She is shuttled to school not by her parents but by rotating day care staffers for a school day that lasts until 3:00 pm. She is picked up from school not by her mother but again by day care staff, where she remains until 4:00 or remains in after school care until about 4:00 or 4:15. Mera Tr. at 68. It is no surprise after such grueling days for a five year old child that she often asks to go to bed early out of exhaustion. Mera Tr. at 69.

For both children, they have no family in Chicago or anywhere in the U.S.—along with their father, both sets of grandparents were left behind in Spain. Mera Tr. at 64. They do not attend church. Mera Tr. at 71. There is little evidence of extracurricular or community activities other than remedial reading programs. Mera Tr. at 75, 78. Their only health insurance is from a

---

Language instructional programs. WiDA, *Interpretive Guide for Score Reports: Kindergarten to Grade 12*, 19 (Spring 2017), available at https://www.wida.us/get.aspx?id=25.

state program for low income families that they will age out of at age 18.[10]  There is no evidence their mother has health insurance.  In short, the children are doing very poorly in the U.S.; isolated from friends, family, their home country, and their native language.  Their only tie to the U.S. is their mother's selfish decision to follow her boyfriend here, putting all three in the tenuous situation of having no place of their own to live and no realistic pathway to legitimate status should the relationship end.

> B. The is No Substantiated Risk of Any Harm, Let Alone Grave Harm or an Intolerable Situation, in Returning the Children to Spain

Though Respondent argues now that the Children would be at "grave risk" upon return to Spain, neither the law nor her prior statements bear out these allegations.

Courts in the Northern District of Illinois have expressly stated that arguments related to a party's strengths or weaknesses as a parent are irrelevant to a grave risk analysis. *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 913-14 (N.D. Ill. 2015) (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995)) ("It is important to note that '[i]t is not relevant to [the grave risk] exception who is the better parent in the long run[.]'"); *Walker v. Kitt*, 900 F. Supp. 2d 849, 862 (N.D. Ill. 2012) (holding that it is not the court's responsibility to determine the child's best interest, it's job "is only to determine whether the Child will face immediate and substantial risk of an intolerable situation in the time period between repatriation and the determination of custody by the courts in" the child's home country); *Habrzyk v. Habrzyk*, 775 F. Supp. 2d 1054, 1070 (N.D. Ill. 2011) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)) ("The 'grave risk' exception 'is not license for a court in the abducted-to country to speculate on where the child would be happiest.'").

---

[10] In comparison, Spain has a constitutional guarantee to universal healthcare, and a system ranked seventh best in the world by the World Health Organization (the U.S. ranks at 37th).  Jerome Socolovsky, Makes Spain's Health Care System The Best? NPR, https://www.npr.org/templates/story/story.php?storyId=112014770

The Seventh Circuit has stressed that, for the "grave risk" defense to apply "the risk of harm must truly be grave" because the court is "responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself." *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011); Text and Legal Analysis, 51 Fed. Reg. 10494 (emphasis provided) ("The person opposing the child's return must show that the risk to the child is grave, *not merely serious*."). Further, "[t]he gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005). Merely presenting evidence that the Children "may be subject to a grave risk or placed in an intolerable situation is not sufficient, nor is evidence of conflict between the parents." *Walker*, 900 F. Supp. 2d at 861 (citing Text and Legal Analysis, 51 Fed. Reg. at 10510). Even if Respondent's recently concocted allegations could be credited, there is no indication why the courts in Spain would fail to offer adequate protection.

In assessing the true gravity of the risk to abducted children in returning them to their habitual residences, courts in the Northern District of Illinois have consistently referred to a case from the Sixth Circuit outlining only two situations in which a grave risk of harm exists for the purposes of the Hague Convention:

> "First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute – e.g., returning the child to a **zone of war, famine, or disease**. Second, there is a grave risk of harm in cases of **serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection**."

*Friedrich*, 78 F.3d at 1069 (emphasis added); *see also Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 873 (N.D. Ill. 2001) (stating same) *Walker*, 900 F. Supp. 2d at 860 (stating same); *Guerrero*, 119 F. Supp. 3d at 911 (stating same). Respondent can certainly not establish that the Children would be subject to war, famine, or disease if returned to Tarragona, Spain. Nor can

she offer any proof that "some nonnegligible probability" of harm exists that the Spanish courts would be ill-equipped to address in a custody ruling. *Habrzyk* , 775 F. Supp. 2d at 1069. The only evidence that Respondent could possibly present to support this defense is her own refuted testimony.[11] This falls far short of clear and convincing evidence of grave risk. *C.f. Van De Sande*, 431 F.3d at 569 (on remand, affirmative defense was upheld based on consistent and uncontroverted evidence of violent weekly beatings, presented via six affidavits, including four from people other than the respondent in the case).

Respondent's arguments related to the "grave risk" defense amount to nothing more than mudslinging by an individual who has abducted the Children away from their father and their home. At most, they are allegations of conduct of the Petitioner toward Respondent and her boyfriend, not the children. As such, they are superfluous to the issue at hand and should not distract from the underlying questions in this case.

Additionally, the fact that such serious allegations of abuse are only now being brought to the Court's attention despite several opportunities for Respondent to raise them earlier both in this Court and in the proceedings she instituted in Spain should raise significant skepticism. In particular, when the Court was facilitating phone calls between Petitioner and the Children, Respondent mentioned only that the Children may not wish to speak with Petitioner because they do not enjoy being in the middle of the divorce and custody proceedings. Respondent did not, at that time, give any indication that either she or the Children might fear Petitioner or that she had cause to worry for their safety. Indeed, the relationship between Petitioner and Respondent in

---

[11] It appears Respondent intends to put her son J.S.M. in an impossible position by urging him to testify against his father with respect to her new defenses. As the Court is aware, Respondent has been isolating and alienating the children from their father since removing them from Spain, including allowing them to talk to their father on Christmas only after an order of the Court. Respondent's eagerness to place a minor child in the witness stand against his own parent makes clear that J.S.M. has been unduly influenced by his mother in this matter and that he may be induced to perpetuate his mother's lies. *Harris v. Thompson*, 698 F.3d 609, 636 (7th Cir. 2012) (The main criteria for establishing competency to testify under Illinois law is "that a child witness understands the duty to tell the truth.").

44552840;1

Spain was clearly tumultuous and both parties allege physical abuse against one another. Respondent has also recently alleged that Petitioner pushed or shoved J.S.M. on one occasion (though she admits to her own use of corporal punishment against both children, Mera Tr. at 49). But on the occasion of these incidents, when making a report to Spanish law enforcement, Respondent specifically noted that Petitioner posed no risk to the children and that she did not wish to prohibit him from seeing or speaking to the children. Mera Tr. at 46-49, Dep. Ex. 3 (Ex. F, Respondent's Report to the Catalan Police in Tarragona.) Respondent further admitted during her deposition that her insinuations of "grave risk" to the children were not based in reality:

> Q. So given these incidents, when you were still living in Spain, did you feel that Mr. Guzman posed a risk to your children?
>
> A. For my children? It was more for me than to my children.

Ex. A, Mera Tr. at 45:17-21.

Respondent's allegations in support of her "grave risk" defense will indicate that Petitioner poses no threat to the children and that there is a clear track record that Spanish law enforcement and judiciary are willing and able to get involved.

> C. J.S.M. Is Not a "Mature Child" Within the Meaning of the Convention Such that His Objections (If Such Objections Exist) May be Considered

Whether a child is indeed mature enough to make this determination must be proven by a "preponderance of the evidence." 22 U.S.C. § 9003(e)(2)(B).

Importantly though, the court is not obligated to employ this defense even if a child has reached an appropriate degree of age and maturity. Text and Legal Analysis, 51 Fed. Reg. 10494 ("This discretionary aspect of Article 13 is especially important because of the potential for brainwashing of the child by the alleged abductor."). "A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." *Id. See also Walker v. Walker*, 701 F.3d

1110, 1123 (7th Cir. 2012) (citing Text and Legal Analysis, 51 Fed. Reg. at 10510) (cautioning the lower court to "be attentive to the possibility that the children's views may be the product of 'undue influence' of the parent who currently has custody."); *Guerrero*, 119 F. Supp. 3d 915 (noting that part of the reason the court discounted the child's testimony was that it was concerned about the undue and unintentional influence of the abducting parent's family). In this case, Respondent has limited contact between Petitioner and the Children for years and has perpetuated lies about this dispute throughout that time.

Even if J.S.M. has reached an age and degree of maturity to express an opinion in this matter, his opinion cannot be determinative in this case because it is informed by his mother's undue influence.[12]

### Conclusion

Accordingly, Petitioner requests that the Court promptly order the turnover of the children to the custody of Petitioner for their immediate return to Spain.

CHRISTIAN ALEJANDRO SANCHEZ GUZMAN

By: /s/ Timothy K. Sendek
　　　One of His Attorneys

---

[12] Petitioner submits concurrently with this Trial Brief its Memorandum of Law Regarding Testimony of J.S.M., which contains additional support for refraining from relying on J.S.M.'s wishes to remain in the United States.

        Timothy K. Sendek
tim.sendek@akerman.com
Akerman LLP
71 S. Wacker Dr., 47th Floor
Chicago, IL 60606
312-870-8007


Sara A. Barnowski
sbarnowski@lathropgage.com
Lathrop Gage LLP
155 N. Wacker Drive, Suite 3000
Chicago, IL 60606-1787
312.920.3300

Dated: March 23, 2018

44552840;1